### BORDER POWER PLANT WORKING GROUP, Plaintiff,

v.

### DEPARTMENT OF ENERGY; Samuel W. Bodman, in his official capacity; Kevin Kolevar, in his official capacity; Bureau of Land Management; Rebecca W. Watson, in her official capacity, Defendants,

v.

### TERMOELECTRICA U.S., LLC; Baja California Power, Inc., Defendant–Intervenors.

### No. 02CV0513–IEGPOR.

United States District Court, S.D. California.

Nov. 30, 2006.

John Martin Wagner, Earthjustice, Oakland, CA, Julia A. Olson, Wild Earth Advocates, Eugene, OR, for Border Power Plant Working Group, Plaintiff.

U.S. Attorney CV, U.S. Attorneys Office Southern District of California, Civil Division, San Diego, CA, Andrew A. Smith, U.S. Department of Justice Environment and Natural Resources, Albuquerque, NM, Brian C. Toth, United States Department of Justice Environment and Natural Resources Div., Washington, DC, for Department of Energy, Carl Michael Smith in his official capacity, Anthony J. Como in his official capacity, Spencer Abraham in his official capacity, Bureau of Land Management, Defendants.

Amy G. Nefouse, Latham and Watkins, Christopher W. Garrett, Latham and Watkins, San Diego, CA, Janice M. Schneider, Latham and Watkins, Washington, DC, for Termoelectrica U.S. LLC, Intervenor Defendant.

Order (1) Denying Plaintiff's Motion for Summary Judgment, (2) Granting Federal Defendants' Cross–Motion for Summary Judgment, (3) Granting Defendant–Intervenor Termoelectrica U.S.'s Cross–Motion for Summary Judgment, (4) Granting Defendant–Intervenor Baja California Power's Cross–Motion for Summary Judgment, (5) Granting in Part, Denying in Part All Defendants' Motions To Strike the First Declaration of William E. Powers, (6) Granting in Part, Denying in Part Plaintiff's Motion To Strike the Declaration of Octavio M.C. Simoes, (7) Granting in Part, Denying in Part All Defendants' Motions To Strike the Second Declaration of William E. Powers, (8) Denying Defendant–Intervenor Termoelectrica U.S.'s Motion To Voir Dire William E. Powers, and (9) Denying as Moot All Defendants' Motions To Strike the Declaration of Theodore D. Schade

GONZALEZ, Chief Judge.

Presently before the Court are cross-motions for summary judgment filed by the Border Power Plant Working Group ("plaintiff"); Department of Energy, Bureau of Land Management, and agency officials ("federal defendants"); defendant-intervenor Termoelectrica U.S., LLC ("T–US"); and defendant-intervenor Baja California Power, Inc. ("Baja"). Also presently before the Court are the following evidentiary motions: defendants' motions to strike the first and second declarations of William E. Powers, and the declaration of Theodore D. Schade; T–US's motion to

voir dire William E. Powers; and plaintiff's motion to strike the declaration of Octavio M.C. Simoes.

## BACKGROUND [1]

### I. Factual and Procedural History of the Prior Litigation

The Department of Energy ("DOE") is responsible for issuing Presidential permits for the construction, operation, maintenance, and connection of electric transmission facilities at the United States international border. [D–1076, at 2; D–1077, at 2.[2]] On February 27, 2001, Baja applied to DOE for a Presidential permit to construct a 230–kV transmission line extending from San Diego Gas & Electric Company's Imperial Valley Substation to the U.S.-Mexico border. [D–1077, at 2.] There, the line would connect with transmission facilities in Mexico and extend to the La Rosita Power Complex in Mexicali. [Id.]

On March 7, 2001, Sempra Energy Resources ("SER") applied to DOE for a Presidential permit to construct a 230–kV transmission line that would run parallel to the Baja line. [D–1076, at 2.] At the border, the line would connect with transmission facilities in Mexico and extend to the Termoelectrica de Mexicali power plant.[3] The primary purpose of both transmission lines is the importation of power into the United States. [DOE–101, at 13.]

Because of the similarity in the proposals, DOE decided to consider both transmission lines in a single environmental document. [D–1077, at 3.] DOE and BLM (collectively, "agencies") concluded that an environmental assessment ("EA") was the appropriate level of review under the National Environmental Policy Act ("NEPA"). [Id.] On December 1, 2001, the agencies completed the EA, and, based on that document, made a finding of no significant impact ("FONSI"). [DOE–101, DOE–103.] DOE issued the permits on December 5, 2001. [DOE–104, DOE–105.] SER and Baja then began constructing the transmission lines, which commenced operation to export electricity from Mexico in July 2003. [Final Environmental Impact Statement ("FEIS"), Vol. 1, at 1–1.]

On March 19, 2002, plaintiff filed its complaint against DOE, BLM, and agency officials challenging the EA and FONSI. [Doc. No. 1, at 2.] Plaintiff alleged causes of action under NEPA for DOE's failure to prepare an environmental impact state-

---

1. The Administrative Record ("record") is a compilation of documents relied upon by the agencies in making their challenged decisions and sets forth the material facts in this case. On January 20, 2006, the federal defendants lodged the record as five CD–ROMs. The first four CD–ROMs contained the materials generated during the preparation of the environmental impact statement ("EIS") and the records of decisions ("RODs") challenged in the present litigation. The final CD–ROM contained the record materials that plaintiff challenged in the prior litigation.

2. The Court cites to the record by referring to the DOE or Bureau of Land Management ("BLM") document number and the page number of the Adobe portable document format (PDF) file.

3. Both proposed transmission lines would cross federal lands managed by BLM, a subdivision of the Department of the Interior. [D–1076, at 2 n. 1.] Therefore, Baja and Sempra each applied to BLM for a right-of-way across the federal lands. Although the Presidential Permits were issued by DOE and the rights-of-way by BLM, both agencies relied upon the same environmental analysis documents. Additionally, for this litigation, the parties focused their briefing almost entirely on the DOE's issuance of the Presidential permits. [But see Pl. Reply, at 37 & n. 26.] For convenience, the Court will follow suit and refer primarily to the DOE permits, although the Court's analysis applies to both agencies' decisions.

ment ("EIS") or to analyze reasonable alternatives. [*Id.*, at 16–19.] The Court granted SER's and Baja's motions to intervene with respect to the remedy phase. [Doc. Nos. 18, 32.] On January 30, 2003, the Court ordered the substitution of T–US for SER.[4] [Doc. No. 42.]

On May 2, 2003, applying the "arbitrary and capricious" standard of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), this Court partially granted plaintiff's motion for summary judgment as to the EA and FONSI's inadequate analysis on the issues of the potential for controversy, water impacts, impacts of ammonia and carbon dioxide, reasonable alternatives, and cumulative impacts. [Doc. No. 91, at 40.] After denying plaintiff's motion for injunctive relief [Doc. No. 124], the Court remanded to the agencies for preparation of appropriate NEPA documents on July 9, 2003. [Doc. No. 162, at 34.] The Court prohibited the agencies from considering on remand the completion of the transmission lines' construction, their interim operation, or the Court's analysis of the environmental impacts. [*Id.*]

## II. *Factual and Procedural History of the Present Litigation*

On October 24, 2003, DOE issued a Notice of Intent to prepare an EIS. [D–0059, at 1.] Pursuant to the Court's remand Order, the agencies "conduct[ed] their NEPA review from a fresh slate, i.e., as if the transmission lines did not exist." [*Id.*, at 8.] On May 11, 2004, DOE published notice in the *Federal Register* that the Draft EIS was available. [D–0702.] DOE originally provided a forty-five day period to comment on the Draft EIS, and extended the comment period by one month at plaintiff's request. [D–0717, at 1.]

On December 10, 2004, the agencies issued the FEIS and filed it with the Environmental Protection Agency. [Fed. Defs. Memo. ISO Motion, at 3; D–1069, at 1.] The FEIS contained a separate volume of comments received during the review period-including the transcripts of two public hearings-along with DOE's responses to those comments. [*See* FEIS Vol. 2.] On April 18, 2005, DOE issued new permits to Baja and T–US. [D–1076; D–1077.]

On April 25, 2005, DOE published the ROD in the *Federal Register*. [D–1085.] The ROD explained what alternatives DOE had considered: (1) no action; (2) granting one or both permits with corresponding right(s)-of-way, based on the current design of the Mexicali power plants ("proposed action"); (3) granting one or both permits with corresponding right(s)-of-way, with more stringent emissions controls and alternative cooling technologies installed at the Mexicali power plants; and (4) granting one or both permits with corresponding right(s)-of-way, with off-site mitigation measures implemented to minimize domestic environmental impacts. [*Id.*, at 3.] On May 27, 2005, the federal defendants notified the Court that the agencies had completed the FEIS and issued new RODs. [Doc. No. 179.]

On August 18, 2005, pursuant to the parties' stipulation, the Court ordered the filing of plaintiff's first amended complaint ("FAC"). [Doc. No. 181, at 4.] The FAC alleges six (6) causes of action: one under the Clean Air Act ("CAA"), four under NEPA, and one under the APA.

The first cause of action alleges that, based on data in the FEIS, the total num-

---

**4.** Pursuant to a reorganization of Sempra Energy, the corporate parent of both SER and T–US, ownership, operation, and mainte-

nance of the SER transmission line passed to T–US. [Doc. No. 39, at 3.]

ber of direct and indirect emissions of pollutants in Imperial County caused by DOE's permitting actions exceeds regulatory thresholds. Therefore, plaintiff alleges the federal defendants violated the CAA by failing to conduct a conformity determination to ensure that the permits conform to California's state implementation plan for Imperial County.

In its opening brief, plaintiff voluntarily dismissed its second cause of action under NEPA for failure to evaluate cumulative impacts adequately.[5] [Pl. Memo. ISO Motion, at 34 n. 23.]

The third cause of action alleges a NEPA violation for failure to evaluate alternatives adequately. Plaintiff specifically alleges DOE failed to evaluate adequately certain alternative technologies, such as wet-dry cooling, that would minimize adverse environmental impacts and still satisfy the purpose and need for the project. Although DOE included a section on alternative technologies in the FEIS, the analysis was so "skewed" by inaccurate information that the alternatives were "never fairly presented to the public or the decisionmakers." [FAC ¶ 42.] Also, when preparing the FEIS, DOE assumed the power plants were already built and operating. Plaintiff alleges this assumption violated the Court-ordered prohibition against the federal defendants' consideration of the interim operation of the transmission lines or the completion of construction. [Id. ¶ 41 (quoting Doc. No. 162, at 33).]

The fourth cause of action alleges a violation of NEPA regulations for failure to ensure the scientific accuracy of relied-upon information. Specifically, in recommending against retrofitting the Mexicali power plants with wet-dry cooling technol-ogy, DOE failed to rely on high-quality data or accurate information about the appropriate design and cost of a wet-dry cooling system. DOE further failed to rely on accurate information in its analysis of the environmental impacts of a wet-dry cooling system, including the potential water savings and corresponding reductions in plant efficiency.

The fifth cause of action alleges a NEPA violation for inadequate analysis of mitigation measures. While the ROD states the proposed action would be implemented without any mitigation, plaintiff alleges the ROD's explanation of the decision not to mitigate is legally insufficient.

The sixth cause of action alleges an APA violation for the defendants' "arbitrary and capricious" agency action. Plaintiff specifically alleges defendants' underlying violations of CAA and NEPA are unlawful agency actions that the APA requires a reviewing court to set aside.

As remedies, plaintiff requests a declaratory judgment that (1) the permits were issued in violation of the CAA, (2) the FEIS and ROD did not comply with NEPA, and (3) defendants violated the APA. Plaintiff also petitions the Court to (1) set aside the permits, (2) enjoin operation of the transmission lines, or, (3) in the alternative, require mitigation measures to offset air and water quality impacts-all pending completion of a CAA-compliant conformity determination and a NEPA-compliant EIS and ROD.

On October 12, 2005, the Court granted T–US's and Baja's motions to intervene in all phases of the case. [Doc. No. 194.]

On October 18, 2005, the federal defendants answered the FAC. [Doc. No. 195.]

5. Despite the voluntary dismissal, plaintiff's reply argues for NEPA violations predicated on the agencies' failure to consider cumula-tive impacts. [See Pl. Reply ISO Motion, at, e.g., 27–28.]

On November 1, 2005, T–US and Baja each answered the FAC. [Doc. Nos. 197–98.]

On February 8, 2006, the Court denied defendant-intervenors' motion to dismiss plaintiff's first cause of action. [Doc. No. 214.] The Court found defendant-intervenors did not "cite[ ] any persuasive authority categorically exempting the emissions from the Mexican power plants from analysis under the conformity provisions of the CAA because they occur outside Imperial County." [*Id.*, at 6–7.] In the absence of said authority, the Court then construed the definition of "indirect emissions" to include the emissions from the Mexican power plants. [*Id.* at 10–16.]

On March 29, 2006, the Court denied plaintiff's motion to bar all defendants from further litigation on summary judgment of issues resolved in the Order denying the motion to dismiss. [Doc. No. 224.] The Court found the "law of the case" doctrine inapplicable because its findings on the motion to dismiss were "not the type of concrete determinations that would ordinarily bar further litigation of such issues[.]" [*Id.*, at 5.]

The Court adopted a briefing schedule for summary judgment motions on February 24, 2006. [Doc. No. 218.] On April 14, 2006, plaintiff filed its motion for summary judgment, accompanied by the declarations of William E. Powers and William R. Stockwell. [Doc. Nos. 225, 227–28.] On June 15, 2006, T–US filed its cross-motion for summary judgment, along with the declarations of Octavio M.C. Simoes and Alberto Abreu. [Doc. Nos. 233, 236–37.] That same day, Baja also filed its own cross-motion for summary judgment, accompanied by the declaration of Perry H. Fontana. [Doc. Nos. 239–40.] Finally, federal defendants filed their cross-motion for summary judgment *nunc pro tunc* to the same date. [Doc. No. 243.]

On August 15, 2006, plaintiff filed its reply in opposition, accompanied by the declaration of Theodore D. Schade and the second declaration of William E. Powers. [Doc Nos. 244–46.] On September 15, 2006, T–US and Baja separately filed their replies. [Doc. No. 259 (Baja); Doc. No. 261 (T–US).] On September 18, 2006, federal defendants filed their reply. [Doc. No. 257.]

On October 6, 2006, the Court held oral argument on the motions for summary judgment and the motions to strike,[6] and took these motions under submission.

## MOTIONS TO STRIKE

Before the Court addresses the parties' legal claims, it must determine what evidence beyond the record is admissible in deciding those claims. Therefore, the Court begins by addressing the parties' motions to strike.

---

**6.** While complying with the summary judgment briefing schedule, the parties also filed motions to strike certain of the declarations accompanying the motion papers. A concise list of those motions appears in the caption and first paragraph of this Order.

At oral argument, the Court granted the following motions: plaintiff's motion to withdraw its motion to file surreply [Doc. Nos. 268–69], plaintiff's motion for leave to file documents referred to in the declaration of Theodore D. Schade [Doc. No. 269], plaintiff's motion for leave to file documents referred to in the second declaration of William E. Powers [Doc. No. 275], federal defendants' motion to file motion for summary judgment *nunc pro tunc* [Doc. No. 270], and T–US's motion for joinder in federal defendants' motion to strike the first and second declarations of William E. Powers [Doc. No. 256.]

The Court now grants Baja's motion to join the motions to strike filed by the federal defendants and T–US. [Doc. No. 258.]

## I. Expert Testimony of William E. Powers

William E. Powers is a professional mechanical engineer and the chairperson of plaintiff's organization. [First Powers Decla. ¶ 1.] In its motion to strike both Powers declarations, T–US argues that Powers is not an expert. T–US explains that Powers does not have a graduate degree in engineering and has experience only in the emissions testing aspects of power plant operations, but not cooling technologies.[7] T–US further alleges that Powers's conclusions are inaccurate because Powers never visited the actual power plants to which the transmission lines are connected.

 Where "specialized knowledge will assist" the Court in understanding evidence, a qualified expert witness may offer opinion testimony, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R.Evid. 702. The district court enjoys great discretion in determining whether the expert's testimony is reliable.[8] Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Applying that discretion to this case, the Court finds Powers is qualified to testify as an expert. Powers co-authored a presentation on dry-cooling systems at an EPA symposium with Ralph Wyndrum.[9] [Second Powers Decla. ¶ 1 & n. 1.] He has made presentations on cooling technologies at conferences sponsored by the California Energy Commission. [Id.; see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (stating that peer review and "submission to the scrutiny of the scientific community" are "pertinent consideration[s]" in determining the validity of an expert's opinion).] He has served as an expert witness on power plant cooling in administrative law cases.[10] Taken together, Powers's experience satisfies the Court that he meets the qualifications of an expert. T–US's remaining objections are focused on Powers's conclusions, and this Court cannot consider the expert's conclusions in the threshold determination of reliability.[11] See Daubert, 509 U.S. at 595,

7. To support its argument about Powers's experience, T–US submits Powers's resume and correspondence with Octavio Simoes. All materials date back to the 1990s, when Powers tried to solicit work from Simoes on an emissions permitting project.

8. The same level of discretion extends to the manner in which the district court determines the reliability of the expert's testimony. Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167. Applying this discretion, the Court is satisfied that Powers meets the requirements of an expert, based on the statements in his declaration and the arguments in the briefs on this issue. The Court denies T–US's request to voir dire Powers.

9. When commenting on the draft EIS, Simoes, in fact, relied on data provided by Wyndrum. [Simoes Decla. ¶ 19.]

10. In fact, after the oral argument, T–US filed an ex parte application asking the Court to take judicial notice of an administrative law decision in which the ALJ rejected Powers's ultimate conclusions. [Doc. No. 279.] The Court takes judicial notice as to Powers's participation in the decision and the fact of the ALJ's decision. However, the ALJ's decision is not helpful to the resolution of this question beyond the fact that the ALJ recognized Powers as an expert. [Id., Exhibit 1, at 31.] Furthermore, in the process of filing this ex parte application, T–US brought the Court's attention to yet another administrative law case in which the ALJ is actually considering the cooling system proposed by Powers. [See id., at 2 n. 2; Doc. No. 280, at 3 n. 2.]

11. The Court recognizes it has the discretion to exclude the expert's testimony where "there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). How-

113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

## II. Extra–Record Evidence

### A. Legal Standard

■ In reviewing a claim under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). A court may not consider evidence outside the record to determine whether the agency made the correct decision. *Asarco, Inc. v. U.S. Envtl. Prot. Agency,* 616 F.2d 1153, 1160 (9th Cir.1980); *Ctr. for Biological Diversity v. Fed. Highway Admin.,* 290 F.Supp.2d 1175, 1200–01 (S.D.Cal.2003). However, the district court may go beyond the record when such evidence helps to explain the agency's action. *Animal Def. Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988), *amended by* 867 F.2d 1244 (9th Cir.1989). Specifically, extra-record evidence is admissible if any of these "narrow exceptions" applies: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.,* 460 F.3d 1125, 1145 (9th Cir. 2006) (quoting *Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir.2005)) (other internal quotations omitted). The first and third exceptions are potentially applicable to these facts.

### B. First Declaration of William E. Powers

■ Plaintiff acknowledges the frequency of Powers's participation during the comment period, identifying at least six documents Powers submitted for the record. [Pl. Opp. to Fed. Defs. Motion To Strike First Powers Decla., at 7–8.] Furthermore, plaintiff repeatedly argues that the information in the First Powers Declaration was contained in the record. [*Id.,* at 1, 7–8.] A court may strike extra-record evidence consisting of information that "already exists in the record" or "[is] extracted from the record." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1451 (9th Cir.1996). The federal defendants argue the First Powers Declaration falls into a Catch–22: either the contents of the declaration are already in the record, or they provide "new, belated criticism" of the agencies' substantive conclusions, and are inadmissible in either case. [Fed. Defs. Reply ISO Motion To Strike First Powers Decla., at 6–7.]

However, under the federal defendants' argument, any challenge to an agency's decision-making process could be construed as an impermissible challenge to its substantive conclusions. Such a construction would leave no room for the established exception allowing courts to consider extra-record evidence where necessary to determine if the agency has considered all relevant factors and explained its decision. The Ninth Circuit recently invoked this exception when it admitted a declaration discussing measurement errors in an

ever, given the highly technical subjects of Powers's testimony and the value of any scientific perspective that can shed light on these subjects, the Court is unable to conclude Mr. Powers is not an expert merely because of his conclusions.

FEIS's analysis of tree mortality rates. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1162–63 (9th Cir.2006). The declaration established the FEIS was "misleading" because the FEIS did not accurately report the findings of the studies it purportedly relied upon. *Id.* at 1166–67; *cf. Hodel*, 840 F.2d at 1437 (where information appears in the administrative record, evidence would still be admissible unless explicitly discussed in the EIS); *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir.1993) (extra-record evidence admissible "[w]hen a failure to explain action frustrates judicial review").

Because of the similar allegations in this case, the Court finds it appropriate to admit portions of the First Powers declaration. For example, the declaration discusses potentially relevant factors-including the existence of power plants of similar sizes in similar climates with dry-cooling systems-that the agency allegedly failed to consider. The declaration also discusses problems in the agency's reasoning-including purportedly incorrect assumptions about the design of the dry-cooling system the power plants could feasibly accommodate-that could potentially call into doubt whether the agency adequately explained its decision.

Furthermore, the subject matter of this case is highly complex and technical. The NEPA causes of action center largely on the engineering design of the cooling system at the power plants. When the federal defendants argue that "the vast majority of the Powers Declaration" improperly goes to Powers's substantive disagreement with the FEIS, they impliedly concede that some portion of the First Powers Declaration would help the Court understand the technical issues in this case. In the first declaration, Powers explains the operation of various types of power plants and their water demands.

Nonetheless, certain paragraphs of the First Powers Declaration clearly do not fall within any of the established exceptions to the rule against extra-record evidence. Therefore, the Court strikes these paragraphs of the First Powers Declaration for the reasons stated:

Paragraph 12 states that T–US's corporate parent, Sempra Energy, asked its cooling vendor to submit a proposed wet-dry cooling system to DOE based on unrealistic assumptions. Criticizing the quality of data submitted by another commenter is not a proper reason to admit extra-record evidence.

Paragraph 14 describes the agreement of the parties on the unit cost of a dry cooling system. Plaintiff does not allege that the agencies failed to consider this factor, nor is this a highly technical computation. For similar reasons, the Court strikes paragraph 15, which discusses the potential costs to ratepayers of a wet-dry cooling system, and paragraph 18, which discusses the parties' agreement on the cost of a new surface condenser.

Paragraph 22 improperly objects to DOE's decision on the merits. It does not object to DOE's decision-making process; any comments directed to the process are duplicative of comments in other paragraphs the Court finds admissible.

Paragraphs 24–27 discuss the feasibility of conducting a CAA conformity determination. Whether the agencies must conduct a conformity determination is a question of law not implicating complex or technical facts. Because the CAA conformity determination is legally separate from the NEPA analysis, the evidentiary exception for the agency's consideration of relevant factors and explanation of its decision does not apply.

### C. Declaration of Octavio M.C. Simoes

Octavio M.C. Simoes is a registered professional engineer and the Vice President of Asset Management for Sempra Generation. [Simoes Decla. ¶¶ 2, 4.] He oversaw development and construction of the Mexicali power plant to which the T–US transmission line connects. [*Id.* ¶ 4.] T–US submitted Simoes' declaration because, "[t]o the extent the Court considers the Powers' declaration, it should likewise consider the Simoes Declaration." [T–US Opp. to Pl. Motion & Memo. ISO Cross–Motion, at 4 n. 4.]

Plaintiff moves to strike the Simoes Declaration because it purportedly amounts to an "impermissible *post hoc* rationalization of an agency decision, made in response to litigation." *See Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984) (holding that such rationalizations are generally inadmissible, and, even when admissible, must not articulate a new rationalization). Plaintiff views the Simoes declaration as a backdoor attempt to patch up gaps in the FEIS's reasoning exposed by this litigation and the First Powers Declaration.

The Court finds, instead, that portions of the Simoes Declaration fall within the well-established exception allowing supplementation of the record "to permit explanation or clarification of technical terms or subject matter involved in the agency action under review." [12] *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982). Among the documents available to the Court, the Simoes Declaration provides the clearest explanation of such technical terms as "duct firing," "efficiency penalty," and "parallel cooling system."

What plaintiff characterizes as "*post hoc* rationalization" is, in most cases, a response to the information introduced in the First Powers Declaration. The Simoes Declaration explains, for example, that the Sempra Generation plant is actually distinguishable from the purportedly similar power plants discussed in the First Powers Declaration. In other words, whereas the First Powers Declaration suggested that other power plants are "relevant factors" the agencies should have considered, the Simoes Declaration establishes that those plants are irrelevant to the agencies' decision regarding the Sempra Generation plant because the Sempra Generation plant is different. *See Earth Island Institute*, 442 F.3d at 1163–64 (where Ninth Circuit allowed plaintiff to introduce an extra-record declaration to show that agency did not consider all relevant factors, agency was allowed to introduce responsive declaration in rebuttal). And, the difference between power plants is itself the kind of complex subject matter for which courts consider supplemental evidence.

Nonetheless, certain paragraphs of the Simoes Declaration clearly do not fall within any of the established exceptions to the rule against extra-record evidence. Therefore, the Court strikes these paragraphs of the Simoes Declaration for the reasons stated:

Paragraph 7 is irrelevant. It attacks Mr. Powers's credentials and praises the high quality of analysis in a document Simoes submitted for the record.

Paragraph 8, in its last sentence, cites paragraphs of the First Powers Declara-

---

12. The concept of the Simoes Declaration as a *"post hoc* rationalization" is initially dubious because T–US is the party submitting the declaration. If the agencies were trying to prop up the FEIS's analysis with the Simoes Declaration, one would have expected the federal defendants to submit the declaration, or, at least, file a brief in opposition to plaintiff's motion to strike the declaration.

tion that the Court has already stricken.[13]

Paragraph 17 does not address the agency's failure to consider relevant factors, nor does it explain technical subject matter. It merely elaborates on documents submitted for the record.

Paragraphs 21–23 merely summarize a document Simoes submitted for the record. [See D–809, Exhibit B.] The Court may not rely on extra-record evidence when it can review the very same evidence submitted for the record.

### D. Second Declaration of William E. Powers

With its reply, plaintiff submits the Second Powers Declaration. Plaintiff argues for the admission of this declaration under the same exceptions as before: determining whether the agency considered all relevant factors, explaining the agency's decision, and understanding technical subject matter. Defendants argue that the Second Powers Declaration does not actually fall within the recognized exceptions and is cumulative of other comments that Powers submitted-both for the record and in his first declaration.

Although the Court applies the same law as it did with the First Powers Declaration, the Court views the Second Powers Declaration more skeptically. The Ninth Circuit has acknowledged the risk district courts face if they admit too much testimony under the exception for technical subject matter: eventually, the technical testimony will cease explaining the subject matter and start reaching impermissibly to the merits of the agency's decision. *Asarco,* 616 F.2d at 1160–61. In *Asarco,* the Ninth Circuit held that the district court abused its discretion because "the scienti-

fic inquiry undertaken at trial necessarily led the district court to substitute its judgment for that of the agency." *Id.* at 1161.

Applied to these facts, the Court perceives the Second Powers Declaration to spend less time drawing the Court's attention to potentially relevant factors not considered by the FEIS or explaining technical subject matter. Instead, the Second Powers Declaration spends more time opposing the Simoes Declaration, interpreting Powers's own submissions to the record, and redirecting the Court's attention to the First Powers Declaration. Plaintiff's NEPA causes of action are directed against the FEIS, not the Simoes Declaration. Furthermore, the Court need not admit Powers's comments on his submissions for the record or his own first declaration; the Court can read those documents for itself. Therefore, the Court strikes the following paragraphs of the Second Powers Declaration for the reasons stated:

Paragraphs 2–4 reiterate and summarize comments Powers submitted for the record.

Paragraph 5 repeatedly cites the Simoes Declaration and the First Powers Declaration, but makes no reference to the FEIS.

Paragraphs 6–8 do not identify relevant considerations the agency failed to consider or explain technical subject matter. Instead, they attempt to cast doubt on the arithmetic in Simoes's submission for the record and speculate about his calculations.

Paragraphs 9–10, though briefly alluding to the FEIS, are devoted to disputing the conclusions of the Simoes Declaration.

---

**13.** Again, T–US offers the Simoes Declaration only to the extent the Court considers the First Powers Declaration. The Court is not considering the paragraphs of the First Powers Declaration cited in the last sentence of Simoes Declaration ¶ 8.

All sentences of paragraph 12 that cite to the Simoes Declaration or First Powers Declaration are irrelevant to the adequacy of the FEIS.

Paragraph 13 exclusively criticizes the Simoes Declaration.

Paragraph 16 discusses the CAA conformity determination. Whether the agencies must conduct a conformity determination is a question of law not implicating complex or technical facts. Because the CAA conformity determination is legally separate from the NEPA analysis, the evidentiary exception for the agency's consideration of relevant factors and explanation of its decision does not apply.

### E. Declaration of Theodore D. Schade

Theodore D. Schade is a professional engineer and an air pollution control officer with the Great Basin Air Pollution Control District. [Schade Decla. ¶ 1.] Plaintiff submits the Schade Declaration in support of its CAA claim. The gravamen of the Schade Declaration is that the FEIS improperly computed the emissions of a particular pollutant that would result from wind erosion at the Salton Sea if the power plants continue to operate. [Id. ¶ 9.]

All defendants' motions to strike the Schade Declaration are denied as moot. In deciding the CAA claim, the Court relies on statutes, regulations, and portions of the FEIS not implicated by the Schade Declaration. Because the Court need not consider the Schade Declaration in its disposition of the CAA claim, it will not consider whether the Schade Declaration falls within one of the established exceptions for admitting extra-record evidence.

### LEGAL STANDARD FOR SUMMARY JUDGMENT

"Under Rule 56(c), summary judgment is proper when the pleadings and discovery, read in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Armstrong v. Burlington N. R.R. Co.*, 139 F.3d 1277, 1278 (9th Cir.1998) (quoting *20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 750 (9th Cir.1992)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" when "the evidence presented is such that a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

Neither NEPA nor the CAA independently provides for judicial review. *Sierra Club v. U.S. Envt'l Prot. Agency*, 346 F.3d 955, 961 (9th Cir.2003) (CAA); *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1176 (9th Cir.2000) (NEPA). Instead, a court reviews agency action under the provisions of the APA. *Id.* The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Under this "highly deferential" standard of review, "the court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir.1986) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The court must not find the agency action to be arbitrary or capricious "unless there is no rational basis for the action." *Id.*

When reviewing final agency action, "resolution of th[e] matter does not require fact finding on behalf of this court.

Rather, the court's review is limited to the administrative record[.]" *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir.1994). In the absence of fact finding, summary judgment is an "appropriate" vehicle for disposing of the legal issues. *Id.*

## CAA CLAIM

### I. Legal Standard

#### A. Conformity Determinations

The CAA directs that EPA "shall by regulation promulgate ... proposed national ... ambient air quality standards [NAAQS]." 42 U.S.C. § 7409(a)(1)(B); *cf.* 42 U.S.C. § 7409(a)(2) (similar). Pursuant to their primary responsibility for maintaining air quality, states must submit a state implementation plan (SIP) "which will specify the manner in which [NAAQS] will be achieved and maintained ... in such state." *Id.* § 7407(a); *cf.* § 7410(a)(1) (SIP must "provide[ ] for implementation, maintenance, and enforcement" of NAAQS). Once a state submits a list of its areas in nonattainment, EPA then promulgates the official designation of the area as "nonattainment" for one or more particular pollutants. *Id.* § 7407(d)(1)(B).

EPA has designated Imperial County as a severe nonattainment area for particulate matter under ten microns in diameter ("PM10 emissions"). EPA has further designated Imperial County as a nonattainment area for ozone. Because ozone is not produced directly, EPA focuses on emissions of its precursors: nitrogen oxides ("NOX emissions") and volatile organic compounds ("VOC emissions"). 41 C.F.R. § 51.852.

The CAA further mandates, "No department, agency, or instrumentality of the Federal Government shall ... license or permit ... any activity which does not conform to an implementation plan." 42 U.S.C. § 7506(c)(1). The CAA instructs EPA to "promulgate ... criteria and procedures for determining conformity[.]" *Id.* § 7506(c)(4)(A). Therefore, EPA has promulgated a regulation stating, "For Federal actions ... a conformity determination is required for each criteria pollutant or precursor where the total of direct and indirect emissions of the criteria pollutant or precursor in a nonattainment ... area caused by a Federal action would equal or exceed" the stated emission rates.[14] 40 C.F.R. § 51.853(b). The conformity determination must rely "on the most recent estimates of emissions." 42 U.S.C. § 7506(c)(1). EPA requires "the latest and most accurate emission estimation techniques available ... (2) such as actual stack test data from stationary sources which are part of the conformity analysis." 40 C.F.R. § 51.859(b)(2).

> EPA has defined indirect emissions as: those emissions of a criteria pollutant or its precursors that:
>
> (1) Are caused by the Federal action, but may occur later in time and/or may be farther removed in distance from the action itself but are still reasonably foreseeable; and
>
> (2) The Federal agency can practicably control and will maintain control over due to a continuing program responsibility of the Federal agency.

*Id.* § 51.852. Emissions are "caused by" a federal action when they "would not otherwise occur in the absence of the Federal action." *Id.* An agency has "continuing

---

**14.** For PM10 emissions, the total of direct and indirect emissions caused by the federal action must not exceed 70 tons per year (tpy). 40 C.F.R. § 51.853(b)(1). For NOX and VOC emissions, the limit is 100 tpy. *Id.* § 51.853(b).

program responsibility" for emissions when they

are specifically caused by an agency carrying out its authorities, and [not] emissions that occur due to subsequent activities, unless such activities are required by the Federal agency. Where an agency, in performing its normal program responsibilities, takes actions itself or imposes conditions that result in air pollutant emissions by a non-Federal entity taking subsequent actions, such emissions are covered by the meaning of a continuing program responsibility.

*Id.*

The issue is whether the federal defendants must conduct a conformity determination for the permitting of the two power plants in this case.

### B. EPA Guidance Document

After EPA promulgated the general conformity rules, it published a questions-and-answers document to "deal[ ] with questions frequently asked of EPA regarding conformity." Office of Air Quality Planning and Standards, *General Conformity Guidance: Questions and Answers* (1994), http://www.epa.gov/air/genconform/documents/gcgqa_940713.pdf, at ii. The guidance document "represents EPA's interpretation of the general conformity rule." *Id.*

When this Court issued its Order on defendant-intervenors' motion to dismiss, question 20 of the guidance document contained the following language:

20. Does the rule apply to activity that occurs in attainment areas that could impact nonattainment areas?

A: If an activity in an attainment area causes indirect emission increases within a nonattainment area, they may have to be analyzed. The current nonattainment rule does not indicate how this situation should be dealt with. Until EPA issues guidance on this, or addresses this instance in an attainment area rule on conformity, Federal agencies should make their own decisions as to how the rule applies to attainment areas with respect to this scenario.

*Id.* at 10. Quoting the first sentence of the answer to this question 20, the Court found that the "Guidance Document does not give clear guidance as to whether emissions occurring outside the United States need to be included in a conformity analysis." [Doc. No. 214, at 8.]

On June 5, 2006, EPA revised its guidance document. William T. Hartnett, Memorandum, *Revision to General Conformity Applicability Questions and Answers*, http://www.epa.gov/air/genconform/documents/Jun06/Revision_to_General%20_Conformity_Applicability_Q&As.pdf, at 1. The memorandum acknowledged CAA amendments, enacted in 1995 after the issuance of the guidance document, which required conformity only in nonattainment and maintenance areas.[15] In response to the statutory amendments, EPA revised question 20 to read as follows:

20(a). Does the rule apply to a Federal activity that occurs outside a nonattainment or maintenance area but may impact nonattainment areas through transport of direct or indirect emissions?

A: No. Consistent with the statutory [amendments] as enacted in 1995, general conformity applies only to federal ac-

---

15. The memorandum explains that the ambiguity of the old question 20 reflected EPA's uncertainty whether the statute required conformity determinations within attainment areas. The 1995 statutory amendments clari-

fied that conformity was not required within attainment areas, thus enabling EPA to issue a document that more clearly stated when conformity was required.

tions undertaken in a nonattainment or maintenance area. Further, federal agencies are not required to undertake a general conformity analysis for a federal action which is undertaken in an attainment or unclassified area and which may cause emissions, whether direct or indirect, in an attainment or unclassified area which may be transported into a nonattainment or maintenance area.

**20(b).** Does the rule apply to a Federal action that occurs inside a nonattainment or maintenance area and has direct or indirect emissions both in and outside nonattainment areas?

A: In this case, only the emissions originating within the boundaries of the nonattainment or maintenance area where the action is taking place need to be analyzed under the general conformity requirements. In other words, *emissions originating outside the nonattainment or maintenance area do not need to be considered in the applicability analysis or conformity analysis,* consistent with EPA's interpretation of [the 1995 statutory amendments].

*Id.* at 2 (emphasis added).

## II. Analysis

### A. Number of Federal Action(s)

■ A threshold question under the CAA claim is whether the Court should treat each permit as a separate federal action, or consider both permits together as a single federal action. Plaintiff asserts that DOE has treated the permitting of the transmission lines as a single action with two components (i.e., two permits). Plaintiff points to the preparation of a single EA and EIS, the issuance of a single ROD, and instances within those documents (including the definition of the proposed action and analysis of environmental impacts) where the agencies treated the issuance of two permits as one action.

NEPA regulations promulgated by the Council of Environmental Quality ("CEQ") urge agencies to analyze separate federal actions in the same EIS where appropriate: if "[s]imilar actions ... provide a basis for evaluating their environmental consequences together, such as common timing or geography[,]" then the agency "may wish to analyze these actions in the same impact statement." 40 C.F.R. § 1508.25(a)(3). Applying this standard, the permits in this case are particularly appropriate for evaluation in the same EIS because the corporate parents of T–US and Baja applied for the permits within about a month of one another, and the transmission lines run parallel over the same federal lands. The agencies properly followed the recommendations of the CEQ regulations.

Furthermore, although the FEIS does occasionally treat the permits jointly, the relevant documents make clear that two different federal actions are at issue. The ROD clearly states, "[d]ue to the similarities of these proposals, DOE and BLM decided to cooperate on the environmental review and to consider both proposals in a single environmental document." [D–1085, at 2.] The FEIS described the proposed action as "grant[ing] one or both permits and corresponding [rights-of-way]." [FEIS, Vol. 1, at S–17.] In considering the emissions of criteria air pollutants from the power plants-a dispositive issue in the plaintiff's CAA conformity claim-the FEIS separates the T–US plant from the Baja plant when reporting the results. [FEIS, Vol. 1, at 4–43.] These examples, along with similar references throughout the FEIS, convince the Court that the agencies avoided *de facto* conflation of the two permits into a single federal action.

Finally, treating the permits as separate federal actions is consistent with this Court's findings in the first round of sum-

mary judgment motions. There, the Court treated the permits separately to determine the environmental impacts of each power plant. [Doc. No. 91, at 17.]

Merely because each permit is a separate federal action, the Court is able to grant summary judgment to Baja. Emissions data provided by plaintiff in its reply brief show that, if the Baja power plant is treated separately from the T–US facility, its total emissions do not exceed conformity determination thresholds. [Pl. Reply ISO Motion, at 22.]

### B. Applicability of Guidance Document

■ Where agencies provide guidelines or comments regarding the implementation of their own regulations, that guidance receives "controlling weight" unless it (1) violates the Constitution, (2) impermissibly construes the governing statute, or (3) "is plainly erroneous or inconsistent with the regulation." *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (internal quotations omitted); *see League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,* 309 F.3d 1181, 1183 (9th Cir.2002) (same). By contrast, where an agency interprets the statute in a context other than formal adjudication or notice-and-comment rulemaking, the agency's interpretation is " 'entitled to respect' ... but only to the extent that th[e] interpretation[ ] ha[s] the 'power to persuade[.]' " *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621

(2000) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)) (internal citations omitted); *see Vigil v. Leavitt,* 381 F.3d 826, 835 (9th Cir.2004) (same, in the context of EPA's publication in the *Federal Register* of preliminary views on certain CAA provisions).

■ Applied to these facts, the Court finds that the guidance document interprets the regulations, rather than the statute. The language of the guidance document itself strongly supports this finding, for the introduction to the document states that it "represents EPA's interpretation of the general conformity rule." *General Conformity Guidance,* at 2. Although both the memorandum introducing the June 2006 revision and the revised question 20 itself reference the 1995 statutory amendments, those references do not transform the guidance document into an interpretation of the statute. Instead, those references are merely intended to confirm that EPA's interpretation of its regulations is consistent with the CAA. The fact that an agency takes pains to interpret its regulations consistently with the statute does not mean the agency is interpreting the statute.[16]

The revised guidance document permissibly construes the governing statute-indeed, EPA revised the guidance document to interpret its regulations consistently with statutory amendments. The broad language of the amendments states that the CAA's conformity provisions "shall apply only with respect to—(A) a nonattainment area." 42 U.S.C. § 7506(c)(5)(A).

---

16. The CAA itself provides remarkably little detail on conformity. The statute prohibits nonconformity with a state implementation plan and defines conformity. 42 U.S.C. § 7605(c)(1). As amended in 1995, the statute limits when the agency must conduct a conformity determination. *Id.* § 7506(c)(5). The statute then leaves to EPA the responsibility to figure out "criteria and procedures for determining conformity[.]" *Id.* § 7506(c)(4)(A). Determining what emissions will count in a conformity determination clearly falls within the "criteria and procedures" that EPA promulgates through regulations. Therefore, when considered from another angle, EPA's guidance document still interprets the regulations.

This language can be interpreted not just to require a conformity determination only in nonattainment areas, but also to limit the conformity determination itself to emissions taking place within the nonattainment area. Although plaintiff argues that the statute's joint definition of "emission limitation" and "emission standard" [17] does not necessarily exclude emissions from outside the nonattainment area, the definition, at most, creates ambiguity on the question of what emissions an agency must take into account in a conformity determination. Because of the statutory ambiguity, and because of EPA's statutory mandate to promulgate regulations concerning the "criteria and procedures" for conformity determinations, 42 U.S.C. § 7506(c)(4)(A), the guidance document permissibly construes the CAA.

The agency's interpretation is not plainly erroneous or inconsistent with the text of the regulations merely because the definition of indirect emissions includes emissions "farther removed in distance from the action itself." 40 C.F.R. § 51.852. Limiting the conformity determination to emissions within the nonattainment area does not render this definition superfluous. The language leaves open the possibility of emissions reasonably foreseeable from the federal action that occur elsewhere within the nonattainment area. Indirect emissions can be "removed in distance" from a federal action while still taking place within a nonattainment area. This possibility is sufficient to make the guidance document's interpretation "not plainly errone-

ous or inconsistent" with the regulations themselves. See Stinson, 508 U.S. at 45, 113 S.Ct. 1913.

Even if the guidance document interpreted the statute, the Court would find it persuasive in this particular context of emissions from power plants in Mexico crossing the international border into Imperial County. As counsel for the federal defendants explained at oral argument, the power plants "[a]re being regulated by a different governmental agency, in this sense a different country, that has primary responsibility for the emissions of those power plants." [Transcript of Motions Hearing ("Trans."), at 40:18–21.] When the Mexican government, and not DOE, issued permits for the power plants in Mexicali, the foreign government, "as the United States government does for facilities in the United States, [made] a bunch of trade-offs into ... the level it wants to impose for environmental protections vs. the need for its economy and generating electricity and jobs[.]" [Id., at 39:16–20.] Elsewhere, the CAA defers to foreign governments' trade-offs on air quality: the EPA Administrator will approve a SIP if the state can show that the SIP "would be adequate to attain and maintain the relevant [NAAQS] ..., but for emissions emanating from outside of the United States." 42 U.S.C. § 7509a(a)(2). Therefore, the guidance document's interpretation is certainly persuasive in excluding emissions outside the country altogether, from sources that are permitted and regulated by a foreign government. [18]

---

17. "The terms 'emission limitation' and 'emission standard' mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or oper-

ational standard promulgated under this chapter[.]" 42 U.S.C. § 7602(k).

18. The federal defendants offered these and other arguments to support the proposition that emissions from the Mexicali power plants are excluded from conformity analysis because the DOE permits are "[a]ctions that implement a foreign affairs function of the United States." 40 C.F.R. § 93.153(c)(2)(xvi-

Therefore, on the basis of the revised guidance document, the Court finds that DOE did not have to consider emissions from outside Imperial County in its conformity determination. Specifically, DOE did not have to consider emissions from the power plants in Mexicali. Without considering emissions from the power plants, and by treating each permit as a separate federal action, plaintiff cannot show that emissions exceed the conformity determination thresholds at the T–US power plant. [*See* Pl. Reply ISO Motion, at 22; Trans., at 6:1–3.] Plaintiff's CAA claim fails as a matter of law.

## NEPA CLAIMS

### I. *NEPA Generally*

"NEPA does not guarantee substantive results." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 682 (9th Cir.2000). Instead, as a "procedural statute," NEPA seeks "to ensure informed agency action." *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir.1996). The dual goals of NEPA analysis are to "foster[ ] informed decision-making and informed public participation."

*California v. Block*, 690 F.2d 753, 767 (9th Cir.1982). The statute "requires only that the agency take a 'hard look' at its decision, and not that environmental concerns trump all others." *Swanson*, 87 F.3d at 343. Where a plaintiff challenges a number of specific points in an EIS, a court "need not 'fly-speck' the document and 'hold it insufficient on the basis of inconsequential, technical deficiencies,' but will instead impose a 'rule of reason[.]'" *Id.* (quoting *Or. Envt'l Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987)). If the EIS "contains a reasonably thorough discussion," the court will approve the EIS even though it may disagree with the agency's conclusion. *Nat'l Parks & Conservation Ass'n*, 222 F.3d at 680 (internal quotation marks omitted).

In situations "where there is conflicting evidence in the record, the [agency's] determination is due deference-especially in areas of agency expertise[.]" *Id.* at 682. When facing conflicting expert opinions, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts[.]" *Morongo Band of Mission Indians v. Fed. Aviation Ad-*

---

ii). For legal authority, federal defendants cite to an Executive Order, a State Department statement published in the *Federal Register*, and a 30–year–old Second Circuit opinion. [Fed. Defs. Memo. ISO Motion, at 13.]

In granting summary judgment to the defendants, the Court does *not* find that DOE's permits fall within EPA's exemption for a "foreign affairs function." Defendants simply do not have enough legal authority to sustain that position. Furthermore, the Court's finding would run directly contrary to the position of the Department of Energy, which maintained, in a 2003 memorandum, that conformity analysis applied to the construction of power transmission lines across the international border. Office of Environmental Policy and Guidance, *Compliance with the General Conformity Regulations* (2003), http://www.eh.doe.gov/oepa/guidance/caa/conformbrf.pdf, at 5.

(Of course, DOE's position also runs contrary to the position taken by EPA's revised guidance document, which the Court adopts here. However, the guidance document-revised earlier this year-has been around a much shorter time than the foreign affairs exemption, which has existed in EPA's regulations for over a decade. Before the guidance document was revised, EPA had directed agencies to interpret the conformity statute to "make their own decisions" on the applicability of the conformity rule. DOE obviously did not believe that transnational power lines were a foreign affairs function.)

In summary, the Court finds that the revised guidance document persuasively explains EPA's regulations (and the CAA). The Court does not find that the foreign affairs function applies to the power plant emissions.

**1060**

*min.,* 161 F.3d 569, 577 (9th Cir.1998) (internal quotations omitted); *see City of Carmel–By–The–Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1151 (9th Cir.1997) (NEPA does not require "unanimity of opinion, expert or otherwise").

## II. Failure To Adequately Evaluate Alternatives

### A. Legal Standard

The EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives[.]" 40 C.F.R. § 1502.14(a). "[T]he heart of the environmental impact statement ... should present the environmental impacts of the proposal and the alternatives in comparative form." *Id.* § 1502.14. The goals of this presentation are "[1] sharply defining the issues and [2] providing a clear basis for choice among options by the decisionmaker and the public." *Id.; cf.* § 1502.1 (requiring that the EIS inform policymakers and the public of "reasonable alternatives" that would benefit the environment). This standard includes "[d]evot[ing] substantial treatment to each alternative considered in detail" and briefly explaining the reason for eliminating any alternative from detailed study. *Id.* § 1502.14(a)-(b).

The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* § 1502.14(a). The court determines the spectrum of reasonable alternatives based on the agency's statement of the purpose and need for the proposed action. *Westlands Water Dist. v. U.S. Dep't of the Interior,* 376 F.3d 853, 866 (9th Cir.2004). In this case, DOE's purpose and need were "to determine whether it is in the public interest to grant Presidential permits ... for the ... transmission lines.... In determining whether a proposed action is in the public interest, DOE considers the impact of the proposed action on the environment and on the relia-

bility of the U.S. electric power supply system." [FEIS, Vol. 1, at S–10.]

An agency does not have to consider "every conceivable permutation" of a given alternative for the EIS evaluation to be adequate. *Westlands,* 376 F.3d at 871. The failure to fully analyze specific alternatives does not make the range of alternatives unreasonable, especially where the agency conducts a "thorough public debate" by directly responding to comments proposing the alternatives that are not fully analyzed. *Id.* at 870–72.

### B. Analysis

#### 1. DISCUSSION OF ALTERNATIVE TECHNOLOGIES

Each power plant currently relies on a "wet cooling system," which uses exclusively water to condense the steam generated by the operation of the turbines. An alternative method of condensing steam is to blow air across it (i.e., a "dry cooling system"). [D–809, at 10.] In the section on alternative technologies, the FEIS considered the possibility of retrofitting one or both power plants with a "wet-dry cooling system" that would combine a wet cooling system with a dry cooling system. [*See* FEIS, Vol. 1, at 2–37–2–40.] The discussion addressed the advantages of dry cooling, including reductions in the amount of water used and waste generated. [*Id.,* at 2–38.] It also addressed the disadvantages of dry cooling, including a decrease in power plant efficiency. [*Id.*] The FEIS specifically considered a wet-dry cooling system that would rely exclusively on dry cooling up to an ambient temperature of eighty to ninety degrees Fahrenheit; above that point, the system would begin to use wet cooling. [*Id.* at 2–39.] Above ninety degrees, the plant would use exclusively wet cooling. [*Id.*]

The retrofit would cost about $75 million. [*Id.*]

Plaintiff objects the FEIS did not consider a different design for the wet-dry cooling system that would have saved more money and water.[19] Specifically, plaintiff proposed a wet-dry cooling system that would have cost $30 million. [D–0743, at 5.] Also, according to plaintiff's proposed design, the power plants would only use one hundred percent wet cooling "on peak temperature days." [*Id.* at 4.] By making use of dry cooling above ninety degrees, the power plants would be able to save more water than if they stopped using dry cooling at ninety degrees. Since a wet-dry cooling system is, according to plaintiff, "the only alternative that would reduce or eliminate adverse impacts to water resources," plaintiff argues the FEIS's discussion of wet-dry cooling is inadequate because it did not consider another proposed design that would have saved more money and water. [Pl. Reply ISO Motion, at 37.]

The Court finds dispositive the FEIS's acknowledgment of Powers's comments for the record and direct response to those comments. Identifying wet-dry cooling as a "Key Issue," the FEIS specifically references one commenter's "recommendation ... that the EIS should analyze a parallel wet-dry cooling technology that would run primarily in dry mode and only be supplemented with wet cooling on the hottest days of the year, resulting in a 90% reduction in water use by the plants."[20] [Vol. 2, at 3–5.] In this section, the FEIS goes on to say that the agencies "consider[ed]

these comments and the associated technical submittals." [*Id.*] It then announces DOE's conclusion: "a parallel wet-dry system that operates primarily in dry mode with only supplemental wet cooling would be an infeasible alternative." [*Id.*] The FEIS then lists reasons to support its conclusion: (1) the power plants have wastewater treatment plants ("WTPs"), (2) the WTPs need a constant flow of water through their bioreactors, and (3) the climate in Mexicali is hot. [*Id.*] Based on its reasoning, DOE concluded "the only reasonable alternative" was the wet-dry cooling system design discussed in over four pages in the FEIS. [*Id.; see* Vol. 1, at 2–37–2–40.]

Another section of the FEIS (seventeen pages in all) is devoted exclusively to responding to Powers's comments. [*Id.*, Vol. 2, 4–59–4–76.] Within this section, the agencies "disagree with the statement in [Powers's] comment that a 'highly effective parallel wet-dry cooling system, designed to reduce water use more than 90% relative to the current wet-only design, could readily be retrofitted to [the power plants].'" [*Id.*, at 4–63.] The agencies concluded a 90% water reduction "is not considered reasonable" in light of the need for a consistently high level of water to sustain the bioreactors. [*Id.*, at 4–63–4–64.] Instead, the agencies cite Simoes's submissions for the propositions that (1) the temperatures in Mexicali are too hot to support a system relying primarily on dry cooling and (2) the retrofit would cost two-

---

19. Plaintiff also claims that the FEIS should have considered the smaller-size system (in terms of the number of cooling cells) that Powers submitted for the record. In his declaration, Simoes claims the size of the dry-cooling design he submitted for the record is the same as Powers's proposed design. [Simoes Decla. ¶ 8.] The FEIS does not appear

to state the exact size of the dry cooling system considered in its section on alternative technologies.

20. Even though the FEIS does not cite Powers as the commenter in question, the FEIS is unmistakably referring to Powers's comments.

and-a-half times what Powers estimated. [*Id.*]

These facts reveal a battle of the experts. Both Powers and Simoes submitted documents for the record. The FEIS makes clear that the agencies actually read both experts' submissions and found Simoes's submissions persuasive. The agencies found Powers's submissions unreasonable, and the FEIS explains why. Clear Ninth Circuit precedent, applied to these facts, says the agencies have done their job. In a battle of the experts, "an agency *must* have discretion to rely on the reasonable opinions of its own qualified experts[.]" *Morongo,* 161 F.3d at 577 (emphasis added). Whether this Court thinks Powers might be more persuasive is irrelevant. *Nat'l Parks & Conservation Ass'n,* 222 F.3d at 680. Nor are agencies required to consider alternatives they deem unreasonable or infeasible. *Carmel–by–the–Sea,* 123 F.3d at 1155. The agencies conducted a "thorough public debate" on wet-dry cooling systems by considering Powers's comments and directly responding to them. *Westlands,* 376 F.3d at 870, 872. The agencies' failure to fully analyze Powers's proposal does not render the FEIS deficient. *Id.* at 871.

In the FEIS's discussion of wet-dry cooling, the agencies also fulfilled their obligations under applicable regulations. In eliminating Powers's proposal from detailed study, the agencies had to "*briefly* discuss the reasons for [its] having been eliminated." 40 C.F.R. § 1502.14(a) (emphasis added). The FEIS provided this discussion. [Vol. 2, at 3–5; 4–63–64.] Furthermore, the agencies "[r]igorously explore[d] and objectively evaluate[d]" an alternative wet-dry cooling system through an extensive discussion of the advantages, disadvantages, and logistics of installing dry-cooling systems at the power plants. [40 C.F.R. § 1502.14(a); FEIS, Vol. 1, at

2–35–2–40.] Finally, the agencies "present[ed] the environmental impacts of . . . th[is] alternative[ ] in comparative form" in a summary chart that considered twelve different environmental impacts. [FEIS, Vol. 1, at S–67–S–76.]

### 2. ASSUMPTION OF POWER PLANTS IN OPERATION

In its July 9, 2003 Order remanding for preparation of NEPA documents, the Court ordered the agencies not to "consider[ ] the interim operation of the transmission lines [or] the completion of the construction[.]" [Doc. No. 162, at 33.] In the FEIS, the agencies explained their "belie[f] that the court ruling to treat the transmission lines as having never been built does not extend to the connected power plants." [FEIS, Vol. 1, at S–2.]

Plaintiff alleges the agencies interpreted this Court's ruling incorrectly; plaintiff believes the Court also instructed the agencies not to consider the construction of the underlying power plants. Therefore, based on this incorrect interpretation, the agencies inflated the cost of installing the wet-dry cooling system because a retrofit is more expensive than installing the system from scratch.

Even if the agencies' interpretation of the Court's ruling is correct, plaintiff argues the agencies still violated the Court's prohibition because the cost estimates take into account the lost income from shutting down the power plants during the retrofit. The power plants lose income during a retrofit because they cannot send electricity across the transmission lines authorized by the DOE permits, and the agencies were prohibited from considering those transmission lines in the FEIS.

The Court finds, first, that the agencies correctly interpreted the Court's July 9, 2003 Order. The Court's instruction to the agencies does not include the words "power plant" anywhere in the sentence.

The phrase "completion of the construction" appears immediately after "interim operation of the transmission lines". Therefore, "of the transmission lines" is implied after the words "completion of the construction".

The Court finds, second, that the FEIS's passing references to lost power sales in estimating the cost of the wet-dry cooling system retrofit did not violate the prohibition in this Court's July 9, 2003 Order. [See FEIS, Vol. 1, at 2–39 ($75 million) "include[s] ... the cost of lost power sales during installation."] As Baja's counsel explained at oral argument, the power plant managers invested so much in building the plants that, even if they could not transmit electricity to the United States, the managers would look for other opportunities to transmit electricity. [Trans., at 90:4–14.] During portions of the retrofit, however, the power plants would be totally shut down, and could not provide electricity anywhere. Therefore, because the agencies properly assumed the completed construction of the power plants when drafting the FEIS, they could also consider the power plants' inability to sell power to any customer while shut down during the retrofit. Furthermore, although the FEIS includes the lost power sales in its $75 million estimate, it cites a document in the record which supports the proposition that the retrofit would cost more than $75 million even without considering lost

sales.[21] [D–809, at 16.] The agencies did not violate this Court's order in their adequate analysis of the wet-dry cooling alternative.

### III. Failure To Ensure the Scientific Accuracy of Relied Upon Information

#### A. Legal Standard

To ensure scientific accuracy, an EIS "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24. The "high quality" information in the EIS must include "[a]ccurate scientific analysis [and] expert agency comments." Id. § 1500.1(b). However, NEPA review "must concentrate on the issues that are truly significant to the action ..., rather than amassing needless detail." Id. In the FEIS specifically, "[t]he agency shall discuss ... any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." Id. § 1502.9(b). Good science is consistent with "NEPA's purpose of providing decision makers and the public with an accurate assessment of the information relevant to evaluate" the proposed action. Natural Res. Def. Council, 421 F.3d at 812.

Inaccurate economic information in an EIS gives rise to a NEPA violation if

---

**21.** The relative unimportance of lost power sales in the overall cost estimate distinguishes these facts from a case in which the Ninth Circuit found the evaluation of alternatives inadequate where the agency relied on an inaccurate market projection in developing its range of alternatives. Natural Res. Def. Council v. U.S. Forest Serv., 421 F.3d 797, 813–14 (9th Cir.2005). In that case, a separate federal statute required the Forest Service to consider the market demand for timber in developing its resource plan for the Tongass National Forest. Id. at 801. The Forest Service had erroneously doubled its

market projection for timber because it had misinterpreted economic projections, and acknowledged such an error throughout the litigation. Id. at 800 & n. 2. Here, by contrast, the consideration of lost power sales is, at best, a marginal consideration in the overall cost estimate for retrofitting the plants. Even without considering lost sales, the retrofit could cost more than $75 million. [D–809, at 16.] The possibility of lost power sales had little or no effect on the range of retrofit costs the agencies considered in analyzing the reasonability of alternative wet-dry cooling system designs.

it " 'impair[s] the agency's consideration of the adverse environmental effects' " and " 'skew[s] the public's evaluation.' " *Id.* at 811 (quoting *Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 446 (4th Cir.1996)).

### B. Analysis

Plaintiff begins with the argument that the FEIS used inconsistent assumptions to make wet-dry cooling as unattractive as possible. The FEIS allegedly based its cost estimate on an extremely large plant design. However, when analyzing the efficiency penalty,[22] the FEIS allegedly considered a different, much smaller plant design, on par with the size of the design proposed by Powers.

The Court finds that plaintiff's argument is based on an incorrect reading of the relevant comment in the record. Plaintiff asserts, "Simoes, on wh[om] DOE solely relied, assumed an unprecedented high number of dry cooling cells as part of the retrofit." [Pl. Memo. ISO Motion, at 22–23.] Specifically, plaintiff asserts that DOE developed its $75 million "inflated cost estimate based on a parallel wet-dry cooling system with 144 cells[.]" [*Id.* at 24.] In fact, the Simoes document cited by the FEIS says no such thing. Instead, the document describes the 144–cell system as "cost-prohibitive" and "not practical."[23]

[D–809, at 4, 12.] The document then proceeds to consider the cost of a retrofit to the Mexicali plant by making comparisons to "Project Alpha," a wet-dry cooling system being installed at another Sempra plant in an arid climate. [*Id.* at 12, 16.] Project Alpha is a thirty-cell system, the same size as the system Powers proposed. [Simoes Decla. ¶ 8.] Therefore, contrary to plaintiff's allegations, the FEIS is not "entirely inconsistent" in its estimates of costs and efficiency penalties. [*See* Pl. Memo. ISO Motion, at 24.] Both points of analysis are based on a thirty-cell dry cooling system.

Plaintiff also strenuously objects to the following passage in the FEIS:

A potential wet-dry cooling system design would use dry cooling to handle the entire cooling load up to an ambient temperature of 80 to 90°F (27 to 32°C). Wet cooling would augment the dry system at temperatures above 80 to 90°F (27 to 32°C); 100% wet cooling could be used on days the temperature is above 90°F (32°C) to ensure maximum power output from the plants (Powers 2004b). The analysis of impacts to water resources assumes that dry cooling will be used at temperatures up to 90°F (32°C).

[Vol. 1, at 2–39.]

Plaintiff objects, first of all, that the cited Powers document [D–0743] does not

---

**22.** The efficiency penalty is the percentage reduction in plant efficiency due to the extra power needed to run the dry-cooling system. The penalty increases as the outside temperatures get hotter. In the layperson's explanation provided by T–US at oral argument, "[W]ater cools better than air, and particularly in Mexicali, where it's hot, hot air just doesn't cool as well as colder water." [Trans., at 108:14–16.]

**23.** The mere fact the Simoes document devotes some attention to a 144–cell design does not transform the FEIS's reliance on other parts of the Simoes document into a NEPA violation. Plaintiff's skepticism of the as-

sumptions behind the 144–cell design cannot form the basis of a NEPA violation when the Simoes document itself rejects that design.

Plaintiff insists the FEIS does rely on the 144–cell design because the FEIS says seven acres of land would be required to build the dry cooling system. Analyzing the FEIS more closely, it says the cooling retrofit "would require an area *as much as* about 7 acres[.]" [Vol. 1, at 2–39 (emphasis added).] This sentence does not commit the FEIS to analyzing a dry cooling system of a particular size; it merely stands for the proposition that dry cooling systems are difficult to install because they are large.

precisely stand for the proposition the FEIS claims. While the Powers document does propose exclusively dry cooling up to a temperature of eighty to ninety degrees, and while the document also says that wet cooling augmentation would begin at these temperatures, a close reading reveals that Powers did not propose exclusively wet cooling above ninety degrees. Instead, Powers stated, "100 percent wet cooling could be used on peak temperature days to ensure maximum power output from the plants." [*Id.*, at 4–5.] Explained another way, the FEIS substituted the words "on days the temperature is above 90°F (32°C)" where the Powers document said "on peak temperature days." By the phrase "peak temperature," Powers meant some temperature hotter than ninety degrees; elsewhere in the Powers document, a chart shows that dry cooling could accomplish at least seventy-five percent of the cooling even when the outside temperature is as hot as one hundred degrees. [D–0743, at 4, 27.]

Part and parcel of plaintiff's analysis is its criticism of the FEIS's climate data. The FEIS projects that exclusively dry cooling would be used thirty-seven percent of the time because the high temperature is less than eighty degrees on thirty-seven percent of the days in Imperial, California. Plaintiff disputes this conclusion because exclusively dry cooling could be used on portions of hotter days when the temperature was below eighty degrees.[24] If the FEIS had relied on hourly climate data, rather than the maximum daily high temperature, plaintiff alleges the agencies would have found exclusively dry cooling could be used a larger percentage of the time.

The gravamen of plaintiff's criticisms is that greater reliance on dry cooling means greater water savings. While the FEIS considers a parallel wet-dry cooling system that would bring about a 56% reduction in water used by the power plants, plaintiff alleges that a 90% reduction could be achieved if the FEIS (1) adopted all the specifications of the cooling system proposed in the Powers document that the FEIS actually cites, and (2) used more precise climate data. [Pl. Reply ISO Motion, at 31–33.]

Plaintiff relies on three cases to support its argument about the inadequacy of the FEIS's scientific analysis. In *Powell*, the Forest Service violated NEPA by using a sedimentation model that "was incomplete and ignored key variables." 395 F.3d at 1031. Relying heavily on the model, the agency did not disclose the model's shortcomings until its decision was challenged on administrative appeal. *Id.* at 1032.

Applying *Powell*, the Ninth Circuit found the Forest Service's soil quality analysis violated NEPA where the agency had failed to observe soil conditions directly in the areas affected by agency action. *Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1068–71 (9th Cir.2005). Although the agency pointed to informal field reports in the record indicating direct soil observation, the court refused to credit those reports because "there [was] no indication in the draft EIS or final EIS that the [agency] actually consulted and relied upon any of the field reports it now cites when it was making its selection[.]" *Id.* at 1071. The Ninth Circuit further refused to defer to the agency's expertise because one of the agency's own experts criticized the agency's analysis on the record. *Id.* at 1069 n. 13, 1070 & n. 15.

---

24. This is to say that, on days when the maximum temperature is between eighty and ninety degrees or even greater than ninety degrees, the temperature is still less than eighty degrees during some hours of the day.

Another NEPA violation in *Austin* was the agency's failure to address the scientific uncertainty regarding the effects of thinning old-growth forest stands on species dependent on old-growth habitat. *Id.* at 1063. The EIS assumed without discussion that thinning the forests would benefit the species and did not meaningfully address the uncertainty surrounding that assumption. *Id.* at 1065. The agency could have avoided a NEPA violation if it had explained why further study on this issue was " 'not necessary or feasible.' " *Id.* (quoting *Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 704 (9th Cir.1993)).

The third NEPA violation in *Austin* was the agency's reversal on whether eliminating newly created post-fire habitat would adversely affect a woodpecker species dependent on that habitat. *Id.* at 1067. Before a fire took place in a national forest, the agency concluded that eliminating post-fire habitat could result in the federal listing of the woodpecker. *Id.* After the fire, the agency then reversed course and concluded that eliminating the habitat would probably not result in federal listing. *Id.* The Ninth Circuit found that the agency had not provided the public with any underlying data, and refused to accept the agency's unsupported conclusion. *Id.* at 1068.

In the third case cited by plaintiff, the Ninth Circuit found a NEPA violation for inaccurate economic information that "inflated the economic benefits and discounted the environmental impacts of the [p]lan." *Natural Res. Def. Council,* 421 F.3d at 811. The agency misinterpreted a study on market demand projection for timber and based its decision on an estimated demand twice the size of the actual demand. *Id.* at 802.

The Court finds these precedents distinguishable. The agencies in this case did not rely on factually inaccurate informa-

tion, nor did they reverse their position during the NEPA process. Instead, the agencies selected one expert's opinion (Simoes) over another expert (Powers). The agencies' reliance on the Simoes document is unmistakable, as the FEIS cites to it during the discussion of why the agencies did not adopt Powers's proposal. [FEIS, Vol. 2, at 4–63–4–64.] In the guise of an allegation the FEIS used scientifically inaccurate information, plaintiff seeks to relitigate in this Court the battle it lost within the NEPA review process. Plaintiff tries to convince the Court to doubt the reliability of the Simoes document, often by directing the Court's attention to the conflicting Powers documents the agencies have already rejected.

To the extent NEPA obligated the agencies to answer Powers's competing perspective, the agencies fulfilled that obligation. *See* 40 C.F.R. 1502.9(b) (FEIS "shall discuss ... any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.") As a specific example, plaintiff insists the FEIS's estimated efficiency penalty is too large, in light of the California Energy Commission's estimated penalty at a purportedly similar power plant. [Pl. Reply ISO Motion, at 28.] Powers presented these objections to the agencies through his comments reprinted in the FEIS. [Vol. 2, at 4–61–4–62.] The agencies responded to Powers's comments by adding a sentence to the FEIS estimating a smaller efficiency penalty for the entire power plant. [*See id.,* Vol. 1, at 2–38–2–39 ("For a typical combined-cycle power plant where the steam cycle accounts for about one-third of the total capacity, overall plant efficiency would be reduced from between 3 to 5%.").] In reducing the estimated efficiency penalty, the agencies were not obligated to reduce

by the full magnitude suggested in plaintiff's comment. The Simoes Declaration, citing accurately to the record, establishes that the California Energy Commission analyzed a power plant with a much smaller steam turbine than the one at issue here. [Simoes Decla. ¶ 13 (citing D–0469, at 5).]

The Court finds the agencies' NEPA analysis did not undermine informed decision-making because the agencies determined that the environmental impacts of the proposed action fell within acceptable limits. Focusing specifically on water impacts (the area which, in plaintiff's view, most clearly manifests the FEIS's purported scientific inaccuracies), the agencies found the Salton Sea would reach critical levels of salinity in about thirty-six years, even if the agencies took no action. [D–1085, at 4.] Because the agencies took the proposed action, the Salton Sea will reach this critical level four days earlier. [*Id.*] With respect to the New River, the ROD recognized that the proposed action would bring about the greatest increase in its salinity, and that a wet-dry cooling system would have the least impact on its salinity. [*Id.*] In announcing the adoption of the proposed action, the ROD explained that the salinity increase from any of the alternatives considered would neither prevent the New River from meeting its water quality objective nor exceed the salinity limits of its wetland plants. [*Id.*]

Explained another way, the ROD said that wet-dry cooling technology has marginally fewer environmental impacts on water resources[25] than the proposed action. However, the agencies did not rely merely on the "negligible" magnitude of the differences in those impacts when they adopted the proposed action. [*Id.*, at 7.] The ROD also relied on the fact that all alternatives, including the proposed action, had "small impacts" on the environment, in an absolute sense. [*Id.*] The gravamen of the ROD's discussion of impacts on water resources is that the environmental impacts of the proposed action are acceptable; therefore, the agencies elected not to adopt alternatives with fewer environmental impacts. In light of this discussion, it would have made no difference if the agencies had used different climate data to conclude that dry cooling would be used more often. The potential extra water savings would not have affected the agencies' analysis because the agencies were satisfied with the water resource impacts of the proposed alternative.[26]

Because of these small environmental impacts, the fact the retrofit might have cost $30 million rather than $75 million did not compromise the agencies' consideration of the environmental impacts.[27] As plaintiff implicitly acknowledges, the DOE ROD rejected wet-dry cooling without con-

---

**25.** The Court makes its findings even without reaching the ROD's analysis on the *greater* environmental impact that wet-dry cooling would have on air quality. [D–1085, at 7.]

**26.** As for the other impacts on water resources mentioned in the FEIS (e.g., the impacts on aquatic species and pilot wetlands), the agencies fulfilled their obligations merely by listing and discussing those impacts. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (NEPA does not prevent agencies "from deciding that other values outweigh the environmental costs.")

**27.** Plaintiff asserts that the FEIS opaquely withheld Powers's proposal of a retrofit that would cost $30 million: "the FEIS does not disclose or reconcile Mr. Powers' expert written comments that ... a parallel wet-dry retrofit on the plants would cost approximately $30 million per plant[.]" [Pl. Reply ISO Motion, at 29.] This assertion is wrong. In reprinting Powers's unredacted comments for the record, the FEIS includes Powers's statement, "the total installed cost of a 30–cell ACC retrofit would be considerably less than $30 million." [FEIS, Vol. 1, at 4–62.]

sidering costs. [*See* Pl. Reply ISO Motion, at 37–38.] Although the BLM ROD did mention a consideration of costs, the Court agrees with federal defendants' interpretation of the agencies' decision: "any water savings at the power plants … clearly would not justify the expense of retrofitting the power plants, even accepting [p]laintiff's estimate of $30 million per plant." [Fed. Defs. Reply ISO Cross–Motion, at 14.]

In addition to the allegations discussed here, plaintiff alleges a host of other scientific inaccuracies in the FEIS, e.g., the frequency of "duct firing," the time it would take to install the wet-dry cooling system, and the steam flow rates at other power plants. The Court finds none of these to be availing. In *Swanson*, the Ninth Circuit upheld a grant of summary judgment for the agency where the plaintiff had challenged "the accuracy of specific points" in the record. 87 F.3d at 344. The court did not analyze those specific points in detail because it refused to "fly-speck" the EIS in light of its "comprehensive discussion" of the proposed actions and their environmental impacts. *Id.* at 343–44. Applied to these facts, the Court finds it sufficient that the FEIS comprehensively discussed the environmental impacts of various proposed alternatives, and explained why it did not consider Powers's proposal to be a reasonable alternative.[28] Nor should this comprehensive discussion be found inadequate merely because it cites Powers for a proposition with which Powers and plaintiff disagree.[29]

The Court further finds the agencies' NEPA analysis did not undermine informed public participation. Any member of the public who read the FEIS learned of Powers's proposal because the entire proposal was printed verbatim in the FEIS. [*See* FEIS, Vol. 2, at 4–61-4–63.] The public received further information about the agencies' response to Powers's proposal because that response appeared directly after the verbatim printing of Powers's comments. [*Id.*, Vol. 2, at 4–63-4–64.] More than four months transpired between the FEIS's publication and the issuance of the ROD in the *Federal Register*. [*Compare* D–1069 (FEIS available to public by December 10, 2004) *with* D–1085 (ROD issued on April 18, 2005).] During that time, interested parties-including the Imperial County Air Pollution Control District, EPA, and the permit applicants, but not plaintiff-actually submitted comments on the FEIS for the record. [D–1073; D–1073a; D–1074; D–1075.]

### IV. Inadequate Analysis of Mitigation Measures

#### A. Legal Standard

 An agency's ROD must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c); *see Ass'n of Pub.*

---

**28.** This comprehensive discussion should not be found inadequate merely because, e.g., the FEIS says the steam flow rate at T–US's power plant is more than ten times greater than the rate at a parallel-cooling plant in Cedar Rapids, Iowa, when the rate is only four to seven times greater. [*See* Pl. Reply ISO Motion, at 35.]

**29.** The Court agrees with federal defendants that "[t]he wet-dry cooling alternative [for which the FEIS cites Powers] includes basic features suggested by [p]laintiff." [Fed. Defs. Reply ISO Motion, at 12.] The FEIS and Powers both agree that dry cooling would be used exclusively up to an outside temperature of eighty to ninety degrees. They likewise agree that wet cooling would be used exclusively on hotter days. They simply disagree about the definition of a hot day.

*Agency Customers, Inc. v. Bonneville Power Admin.,* 126 F.3d 1158, 1187 (9th Cir.1997) (allowing the satisfaction of this requirement by adequate analysis in the EIS). The agency must take a "hard look" at mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1380 (9th Cir.1998) (quoting *Robertson,* 490 U.S. at 353, 109 S.Ct. 1835). Merely listing mitigation measures is not enough. *Id.* Nor can the agency typically get by with "broad generalizations and vague references to mitigation measures." *Id.* at 1381; *see Carmel–By–The–Sea,* 123 F.3d at 1154 (noting that the absence of "a reasonably thorough discussion of mitigation measures ... would undermine the action-forcing goals of [NEPA]"). However, the agency can "describe[ ] in general terms and rely on general processes, not on specific substantive requirements," especially when actual adverse effects are uncertain and the EIS extensively analyzes the potential effects. *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 477 (9th Cir.2000).

In *Cuddy Mountain,* the Forest Service approved a timber sale that would increase sedimentation in three creeks to the detriment of redband trout. 137 F.3d at 1380. The Ninth Circuit held the discussion of mitigation measures inadequate under NEPA because the Forest Service did not even consider mitigation measures for the particular creeks and instead expected that undefined mitigation measures elsewhere in the forest might compensate for the harms to the creeks. *Id.* The Ninth Circuit also faulted the agency for failing to estimate how effective the mitigation measures would be if adopted, or to reasonably explain why mitigation would not be possible. *Id.*

The procedural requirement to discuss mitigation measures, however, is distinct from "a substantive requirement that a complete mitigation plan be actually formulated and adopted[.]" *Robertson,* 490 U.S. at 352, 109 S.Ct. 1835. In *Robertson,* the Supreme Court held that agencies have no obligation to adopt mitigation measures. *Id.* at 353, 109 S.Ct. 1835.

*B. Analysis*

The DOE ROD identified the adoption of off-site mitigation measures, including road paving, as the environmentally preferable alternative. [D–1085, at 6.] Despite that identification, DOE did not select the mitigation measures alternative for the following reasons:

> Whether, and the extent to which, these measures can in fact be implemented, however, can depend in part on factors outside the [permit] applicants' control. Most of the mitigation measures would require some degree of approval and cooperation from local and state agencies for their implementation. Also, existing local agreements could diminish the positive effect of some of the measures.

[*Id.*] Plaintiff faults this ROD because it "does not state why each individual, practicable measure to mitigate impacts of the selected alternative was not adopted." [Pl. Memo. ISO Motion, at 32.]

By confining its arguments to the ROD, plaintiff would seek to prevent the Court from considering the simply exhaustive discussion of mitigation measures in the FEIS. *See Bonneville Power Admin.,* 126 F.3d at 1187 (sufficient analysis in EIS satisfied 40 C.F.R. § 1505.2(c), which facially requires discussion of mitigation in ROD). One reason for the long list of measures is that DOE affirmatively contacted plaintiff to solicit its suggestions about off-site mitigation that DOE could

consider. [FEIS, Vol. 1, at 2–40, 4–62.] That discussion is particularly impressive with respect to water resources, because the FEIS individually describes each of five measures, explains arguments against its adoption, and, at the end, summarizes the entire slate of measures. [*Id.*, Vol. 1, at 4–27–4–30.]

As for road paving, the FEIS does explain why that alternative was not adopted. In the short term, paving roads would have increased soil erosion and the deposit of sediments in nearby water. [*Id.*, Vol. 1, at 4–30.] Making remote areas easier to access "could result in adverse impacts to current land use." [*Id.*, Vol. 1, at 4–86.] Before road paving could even begin, agencies would have to conduct a burdensome review to determine the impact on protected species and cultural resources. [*Id.*, Vol. 1, at 4–73, 4–83.] In addition, road paving would cost $430,000 per mile. [*Id.*, Vol. 1, at 2–42.]

The agencies' FEIS in this case avoided the pitfalls of the EIS in *Cuddy Mountain.* There, the EIS did not consider mitigating measures for the creeks actually affected by the agency's action, did not estimate the effectiveness of mitigation measures if they were adopted, and relied on "broad generalizations and vague references." 137 F.3d at 1381. Such criticisms ring hollow against this FEIS, which considers mitigation measures in twelve different areas of environmental impacts, and then summarizes its findings in an easily comprehensible chart. [FEIS, Vol. 1, at 2–44–2–53.]

By claiming that the agencies must provide an itemized explanation on mitigation measures, plaintiff has overstated what the law requires. Here, the DOE ROD concluded the proposed action had "low potential environmental impacts[.]" [D–1085, at 7.] Where environmental impacts are minimal or speculative, an EIS may "focus on broad mitigation measures." *Nat'l Parks & Conservation Ass'n*, 222 F.3d at 681. But, even if the plaintiff had correctly stated the law, this FEIS satisfied such a high standard. When the FEIS discusses mitigation measures so extensively, plaintiff cannot make out a NEPA violation by focusing narrowly on the ROD.

## CONCLUSION

Because each permit is a separate federal action, and because EPA's interpretation of its regulations does not require DOE to consider emissions from the Mexicali power plants in its conformity analysis, the Court **DENIES** plaintiff's motion for summary judgment on the first cause of action. The Court **GRANTS** all defendants' cross-motions on this cause of action.

Because the agencies rigorously explored and objectively evaluated all reasonable alternatives and briefly discussed the reasons for not considering other alternatives, and because the agencies properly interpreted this Court's Order remanding for more NEPA review, the Court **DENIES** plaintiff's motion for summary judgment on the third cause of action. The Court **GRANTS** all defendants' cross-motions on this cause of action.

Because the agencies found minimal environmental impacts from the proposed action and responded to Powers's comments in the record, the NEPA analysis did not undermine informed decision-making or informed public participation. Therefore, the Court **DENIES** plaintiff's motion for summary judgment on the fourth cause of action. The Court **GRANTS** all defendants' cross-motions on this cause of action.

Because the FEIS thoroughly discusses mitigation measures, including some proposed by the plaintiff, the Court **DENIES**

plaintiff's motion for summary judgment on the fifth cause of action. The Court **GRANTS** all defendants' cross-motions on this cause of action.

Because of this Court's finding that neither NEPA nor CAA were violated under the first five causes of action, the Court **DENIES** plaintiff's motion for summary judgment on the sixth cause of action. The Court **GRANTS** all defendants' cross-motions on this cause of action.

Some paragraphs of the First Powers Declaration, Simoes Declaration, and Second Powers Declaration fall within the established exceptions for admitting extra-record evidence. Therefore, the Court **GRANTS IN PART** and **DENIES IN PART** all defendants' motions to strike the First and Second Powers Declarations. The Court **DENIES** T–US's motion to voir dire Powers. The Court also **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion to strike the Simoes Declaration.

The Court **DENIES AS MOOT** all defendants' motions to strike the Schade Declaration.

This Order hereby **CONCLUDES** the litigation in this case.

**IT IS SO ORDERED.**